UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TYLER BAUMANN,<br><br>Defendant | Crim. No.  17-CR-10211-DPW<br><br>VIOLATIONS:<br><br>18 U.S.C. § 371 (Conspiracy to Distribute Controlled Substances)<br><br>18 U.S.C. § 371 (Conspiracy to Traffic Counterfeit Drugs)<br><br>18 U.S.C. § 1956(h) (Conspiracy to Engage in Money Laundering)<br><br>21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances)<br><br>18 U.S.C. § 2320 (Trafficking Counterfeit Drugs)<br><br>18 U.S.C. §§ 981(a)(1)(C), 982, 2323(b), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c) (Criminal Forfeiture Allegations) |

## UNITED STATES' SENTENCING MEMORANDUM

The United States submits this memorandum in advance of the sentencing on March 15, 2018 of Tyler Baumann.  Defendant has pleaded guilty to  (1) conspiracy to distribute counterfeit testosterone, trenbolone, and other steroid compounds that are Schedule III controlled substances in violation of 18 U.S.C. § 371; (2) conspiracy to traffic in counterfeit drugs in violation of 18 U.S.C. § 371; (3) conspiracy to launder money in violation of 18 U.S.C. § 1956(h); (4) possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841; and (5) trafficking in counterfeit drugs in violation of 18 U.S.C. § 2320.  The Government recommends that Baumann be sentenced to a term of incarceration of 135 months (significantly

1

below the GSR of 188-235 months), to be followed by a term of supervised release of 36 months.

### I. Baumann Was the Co-Leader of a Criminal Organization that Brazenly Sold Counterfeit Steroids on the Internet

#### A. *The Onyx Counterfeit Steroid Organization*

The Onyx Counterfeit Steroid Organization began manufacturing steroids using the "Onyx" label beginning in at least May 2015 and continuing until April 2017.[1] PSR ¶ 9. Tyler Baumann and Phillip Goodwin were the co-leaders of the organization. PSR ¶ 12. Goodwin ordered both the raw materials for the injectable steroids and the labels and packing bearing the Onyx trademarks from overseas suppliers. PSR ¶ 9, 13. Goodwin then manufactured and packaged the Onyx steroids at his home, which he shared with his girlfriend and three children. Id. While the Onyx-branded steroids were all injectable steroids, Baumann and Goodwin also obtained and sold other steroids in pill form ("orals"). PSR ¶ 10.

Baumann marketed the Onyx products on social media, primarily Instagram, and arranged for the sale of the products using email. PSR ¶ 9. Customers paid for the steroids via money remitters such as Western Union and MoneyGram. Id. Baumanm directed other members of the conspiracy to ship steroids to customers and collect the proceeds. PSR ¶ 9, 12. The members of the conspiracy who collected the illicit customer payments used false identifications and multiple

---

[1] While the PSR states that the conspiracy ran from February 2016 until April 2017, this was an error in the offense conduct (accurate as to another defendant) that the government failed to notice until preparing for the sentencing. It is undisputed that the organization actually began in at least May 2015. Not only is there evidence from that time period, but the Information in the instant case states the accurate time period.

remitter locations to attempt to avoid suspicion while picking up the significant proceeds of the organization. PSR ¶ 9.

Baumann and Goodwin also conspired with Melissa Sclafani to launder the illicit funds of the organization. Together, Baumann and Goodwin were co-owners of a tanning business in Beverly, MA, Wicked Tan LLC ("Wicked Tan"). PSR ¶ 12. Sclafani operated Wicked Tan, and assisted Baumann and Goodwin in using the business to hide proceeds of the illegal activity, by creating the impression that the money was revenue generated by the tanning business. PSR ¶ 34.

### B. Baumann's Role as the Public Face and Co-Leader of the Organization

Baumann both managed the critical logistical aspects of the operation and was the primary driver of the marketing of the Onyx steroids. Baumann created and cultivated a social media presence, using the persona "musclehead320," on a number of platforms. PSR ¶ 12. As "musclehead320," Baumann claimed to be "sponsored" by Onyx, and promoted the effectiveness of the product. Id. At the same time, Baumann created and posted on Instagram accounts dedicated to the marketing and sale of the Onyx products, including "onyx_roid" and "onyxpharma." Id. These Instagram accounts directed potential buyers to email accounts operated by Baumann, to place their orders. PSR ¶ 12. Baumann directly coordinated with Robert Medeiros, the primary shipper of the steroid products, to send the steroids to customers across the country. PSR ¶ 12, 28. Each week, Medeiros provided Baumann with a tally of his earnings, ($10 per package shipped) and Baumann provided cash to K. Green to pay Medeiros. Id.

The organization was long running, nationwide, and very profitable. PSR ¶ 9, 10. The sale of just the Onyx-branded products alone exceeded $1.5 million dollars. Id.[2] Based on the

---

[2] As noted in the PSR, the government has done additional analysis of the volume of Onyx products sold. While the initial methodology was found to contain some errors, by using a more rigorous analysis, based on the actual orders in the emails for particular months, the

estimates of co-conspirator Baumann, the Onyx sales (injectable steroids) represented half of the business; the other half was oral steroids (pills). By any estimate, the Onyx Steroid Organization was a multi-million dollar illegal steroid enterprise.

### C. The Status of other Members of the Conspiracy

. On April 12, 2017, pursuant to a criminal complaint, six members of the conspiracy were arrested: Goodwin, Baumann, K. Green, Sclafani, Medeiros and Brian Petske (another shipper in the organization). Ultimately, only Goodwin and Petske were indicted; the remaining defendants each pled guilty to an Information. Later, Elizabeth Green, Katheryn's sister, also pled guilty to an Information, for her role in picking up proceeds from money remitters.

The charges against each of the defendants in related cases is listed in the PSR at ¶ 6. K. Green and Baumann are the first defendants that will be sentenced: K. Green is scheduled to be sentenced on Tuesday, March 13, 2018 (17-CR-10210-NMG) and Baumann's sentencing in the instant case is scheduled to occur two days later, on March 15, 2018.

## II. The Sentencing Guidelines Calculation is Undisputed, and the Resulting Guidelines Sentencing Range is Considerably Higher than the Government's Recommended Sentence of Incarceration

*The Applicable Guidelines Calculations*

There is no dispute regarding the appropriate guidelines calculation, as outlined in the PSR ¶ 40- 53:

| | |
|---|---|
| Base offense level (USSG §2B5.3(a)) | + 8 |
| Adjustment for Loss Between $1,500,000 and $3,000,000 (USSG §2B5.3(b)(1)) | +16 |
| Adjustment for importation of infringing items (USSG §2B5.3(b)(3)) | +2 |

---

government verified that its initial estimate of an infringement amount between $1.5 million dollars and $3.5 million dollars is, even by conservative estimates, the appropriate guidelines range.

| | |
|---|---:|
| Adjustment because the offense involved a counterfeit drug (USSG §2B5.3(b)(5)) | +2 |
| Increase for conviction under 18 U.SC. § 1956 (USSG §2S1.1(a)(1)) | +2 |
| Adjustment for being an organizer/leader with five or more participants | +4 |
| **Adjusted Offense Level** | **34** |
| Adjustment for acceptance of responsibility (USSG §3E1.1(a) and (b)) | <u>-3</u> |
| **Total Offense Level** | **31** |

As described in the PSR, Baumann is a career offender, and thus Criminal History Category IV. As a result, the resulting Guideline Sentencing Range (GSR) is **188-235 months.** The parties agree on the accuracy of the guidelines calculations.

*The Onyx Steroid Organization Deliberately Exploited the Intellectual Property of a Legitimate Pharmaceutical Company to Advance its Counterfeit Steroid Sales*

Baumann argues that the GSR is "excessive" because it is driven by the counterfeiting offense, when the case is more properly viewed as a steroid manufacture/distribution case. He notes that Onyx Pharmaceuticals did not make anabolic steroids, and thus the sales of "Onyx" steroids did not displace company sales. The government does not dispute this fact. But the government disagrees that this case would fundamentally be the same regardless of whether Baumann and Goodwin chose to use the Onyx trademarks or had simply called the steroids "Tyler and Phil's Steroids" and sold them without logos or holograms. Baumann and Goodwin used the Onyx trademarks because doing so aided in the marketing and sale of their products— with the marks the products looked professional, they looked safe, and they looked like they had been made in a real facility—not the residential home where Goodwin, a heroin addict, lived with his girlfriend and four children.

Below is a photograph from the "onyx_roid" Instagram account posted on May 2, 2015 by Baumann, which evidences the measures that were taken to make the product appear

legitimate, including using the Onyx trademarks, using holograms, using legitimate packaging, and creating "Lot Numbers":



There is no dispute that these "Onyx" steroid products clearly display the Onyx name and other trademarks, as outlined in the Information.  But Baumann essentially argues that it should not matter, because it did not result in economic loss to the trademark holder.  Baumann's argument fails to account for another purpose of the criminal copyright infringement statutes: protection of the health and safety of the American consumer.  The professional labels and logos that appeared on the Onyx packages were examples of the types of marks that consumers look for—they signal that the drug they are putting into their body has been created in a controlled, regulated environment.  When someone takes advantage of that the trust built by the company and the regulatory system to make an illegal profit, it is not only a serious crime, but it can also be a dangerous one.  It was in recognition of this harm that in July 2012 the federal statute that criminalized trafficking in counterfeit goods, 18 U.S.C. § 2320, was amended to add a specific

provision for trafficking in counterfeit drugs.  The amendment both provided for a higher maximum penalty for this specific subsection of the statute and it called for a creation of a sentencing enhancement under the guidelines.  The use of counterfeit marks in the marketing and sale of drugs implicates significant health and safety concerns.  The statute and associated guidelines provision were specifically intended to deter that harm.

> *The Government is Already Supporting a Significant Departure from the Applicable Guidelines Sentencing Range and a Further Departure is Not Warranted.*

There is no dispute that the accurate guidelines calculation is 188-235 months.  The government has already acknowledged that the unique circumstances of Baumann being charged with a criminal copyright charge with a statutory maximum of 20 years and a drug offense for distribution of steroids, combined with his criminal history category, have resulted in him being categorized as a career offender, and resulted a criminal history category of IV.  Baumann suggests that the government has blindly applied the relevant guidelines and overstated his culpability.  To the contrary, despite the fact that all parties agree that Baumann is as a career offender under the law, in recommending a sentence of 135 months, the government is recommending a sentence at the low-end of the guidelines range for a category III defendant (135-168 months).  This is a significant departure, and no further departure is warranted.

### III. The Court Should Impose a Term of Incarceration to Deter both Baumann and others from Committing Similar Crimes

Baumann has a significant criminal history, and both the PSR and his own sentencing memo detail his significant exposure to drug trafficking from a young age.  Baumann's decision to organize and lead a steroid trafficking organization was formed after having served a multi-year term of incarceration for trafficking cocaine.  He was not deterred from actively engaging in a criminal enterprise, and leading others—including his fiancé and her sister—in the same

activity.  Rather, he appears to have made the calculated choice that making and selling steroids was less risky than other types of criminal behavior.  In order to deter further criminal activity upon his release, Baumann needs to sentenced to a significant term of incarceration for these offenses.

      Moreover, others in both the steroid industry and those who seek to sell counterfeit drugs need the clear message that such crimes will be met with terms of incarceration.  Baumann, and others in the organization, have expressed directly their surprise at the charges and potential consequences.  Baumann writes in his letter to the court "It was stupid.  I knew it was wrong.  I knew it was illegal.  But if I knew something that helps you build muscle would get me in such trouble as it has I truly would have never went for it."  Dkt. No. 76-2.  The government does not doubt the sincerity of that statement.  It is precisely why a general deterrence message is necessary here.  This is especially true where it is relatively easy for an individual to commit this crime.  The borders are large, and anyone with internet access and a desire to do so has the ability to order pills, labels, packaging, raw materials, and other supplies to create and sell counterfeit drugs.  Those considering following Bauman's example should be shown that the consequences of his crimes were significant.  *See generally United States v. Martin,* 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool and calculated then sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence") (Internal quotation omitted.)  A term of incarceration is appropriate to reflect the harm that Baumann has caused and to serve as both a specific deterrent to him and a general deterrent to others that contemplate marketing and manufacturing counterfeit drugs.

## CONCLUSION

For the above reasons, the government asks the Court to impose on Baumann a 135-month term of incarceration, to be followed by a 36-month term of supervised release, and forfeiture as noted in the plea agreement. A $500 special assessment is also due.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney

By: */s/ Amy Harman Burkart*
        AMY HARMAN BURKART
        David J. D'Addio
        Assistant U.S. Attorneys

Dated: March 10, 2018

## **CERTIFICATE OF SERVICE**

    I, Amy Harman Burkart, hereby certify that on March 10, 2018, I served a copy of the foregoing by electronic filing on counsel for the defendant.

                                            */s/ Amy Harman Burkart*
                                            Amy Harman Burkart